UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARCUS HILLIARD,<br><br>  Plaintiff,<br><br>  v.<br><br>LOYOLA UNIVERSITY OF CHICAGO,<br><br>  Defendant. | Case No. 20-cv-01144<br><br>Judge John Robert Blakey |

## MEMORANDUM OPINION AND ORDER

Plaintiff Marcus Hilliard sues Defendant Loyola University of Chicago under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12182 *et seq.*; 28 C.F.R. § *et seq.*, alleging it violated the ADA by failing to accommodate Plaintiff's disability and dismissing him as a student at Stritch School of Medicine. [113].[1] Following discovery, Defendant moved for summary judgment, [142], and moved to exclude Plaintiff's expert witness Jon D. Sand, [165]. For the reasons explained below, the Court grants Defendant's motion for summary judgment and denies Defendant's motion to exclude as moot.

---

[1] Plaintiff initially filed suit against the National Board of Medical Examiners but dropped his claim following a settlement agreement with that party and proceeds against Loyola University of Chicago alone. *See* [110]; [112].

I.  **Background**[2]

Since a young age, Plaintiff has had a learning disability and specifically received diagnoses of dyslexia, DSM V 315 (a specific learning disorder, with impairment in reading), and DSM V 315.20 (a specific learning disorder, with impairment in written expression). [164] ¶ 1. Plaintiff enrolled at Loyola University Chicago Stritch School of Medicine ("Loyola" or "Stritch") in 2015 and requested accommodations for his disability prior to his matriculation. [153] ¶¶ 2, 11. The Technical Standards Committee ("TSC") approved Plaintiff's request for separate space and time-and-a-half on exams. *Id.* ¶ 12. TSC later granted Plaintiff double time on exams after he provided a psychologist report recommending that accommodation. *Id.* ¶ 13.

The Academic Center for Excellence and Accessibility ("ACE") operates as a dedicated resource for medical students to receive additional support, including implementing accommodations for students with disabilities. *Id.* ¶ 6. Stritch additionally approved the following accommodation requests from Plaintiff: prior access to small group question sets, delayed clerkship exam schedules, and additional time for clinical presentations, patient notes, and record review within the limits of the learning environment. *Id.* ¶ 56. Plaintiff admits that he had extensive

---

[2] The Court draws these facts from Defendants' Rule 56.1 Statement of Facts [145] (including exhibits), Plaintiff's Rule 56.1 Statement of Additional Facts [154] (including exhibits), and the responses thereto [153], [164], where supported by the record. To the extent Defendant challenges Plaintiff's response and additional facts, the Court has discretion to apply the 56.1 rules "strictly or to overlook any transgression." *Waldrige v. Am. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

2

communication with Loyola about his reasonable accommodations, as summarized in a 74-page chart he produced of those communications. *Id.* ¶ 54.

Plaintiff states that he did not always receive the small group questions in advance and TCS denied the following requested accommodations: additional time to see patients, temporal separation between clinical responsibilities and clerkship examinations, scratch paper during PCMR2 Standard Patient Exam, accommodations regarding a decelerated schedule, materials for a particular course, accommodation during a standard patient exam, meetings with attendings for clerkships, and accommodations during clerkships. *Id.* ¶ 56. TSC initially denied Plaintiff's request for temporal separation between his clinical responsibilities and clerkship exams because it would fundamentally alter the learning experience. *Id.* ¶ 58. After meeting with Dean Sonntag to discuss a proposed schedule and going "back and forth" to develop an appropriate schedule, TCS granted Plaintiff's accommodation request. *Id.* ¶¶ 59, 60.

On Wednesday, February 1, 2017, a proctor did not provide Plaintiff with his accommodation of double time for a portion of an OSCE exam. *Id.* ¶ 72. Stritch gave Plaintiff the option of retaking the full exam or picking up where he left off with additional time, and Plaintiff retook the exam. *Id.*

In Plaintiff's first year at Stritch, he failed one course, Host Defense, but successfully remediated the exam. *Id.* ¶ 14. Plaintiff failed another course his second year, did not successfully remediate the exam, and later successfully re-took the class.

3

*Id.* ¶ 15. Also, during his second year, Plaintiff received an "Unsatisfactory" grade for Mechanisms Human Disease II based upon concerns regarding his medical knowledge, interpersonal and communication skills, and professionalism, though Plaintiff successfully remediated this class, too. *Id.* ¶¶ 16, 17. In his third year, Plaintiff received "Unsatisfactory" grades in his Family Medicine and Psychiatry Clerkships, and his evaluations noted concerns regarding Plaintiff's medical knowledge, patient care, and professionalism. *Id.* ¶¶ 23, 24.

Plaintiff's instructors also noted several important concerns regarding his professionalism during his time at Stritch. One competency performance report noted "Marcus showed poor judgment and professionalism in the presence of his colleagues and course administrators with an outburst during a small group representative meeting," *id.* ¶ 34, and another noted similar professionalism concerns, *id.* ¶ 35. Plaintiff admitted on two occasions he falsely signed an attendance sheet for classes that he failed, in fact, to attend, [145-3] at 50–51 (Ex. 3, 193:6–9, 24–194:4), and the Course Director, Dr. Theresa Kristopaitis, filed a professionalism report about the incident. [153] ¶ 35.

In early 2017, Plaintiff recorded an encounter with a patient without asking for permission, *id.* ¶ 36, and recorded MHD small group class sessions, also without permission. *Id.* ¶ 37. After Plaintiff received feedback from his instructor, Dr. Kumar, that he did not meet expectations in his participation during small group sessions, Plaintiff sent an email to his classmates stating: "So I wanted to reach out

4

to y'all to see if you remember a time when you ever felt intimidated, humiliated or made to feel stupid by Dr. Kumar." *Id.* ¶ 39. Dr. Kristopaitis filed a professionalism report regarding Plaintiff's email. *Id.* In a conversation with Medical Education Coordinator Ms. Caterina Goslawski, Plaintiff said he did not want Dr. Kristopaitis to come down on her "like a vampire." *Id.* ¶ 40. Ms. Goslawski reported the incident to Dr. Clipstone, who submitted a Professionalism Report on her behalf. *Id.* Plaintiff claims the term is "a very common colloquialism in Texas" and meant he did not want Ms. Goslawski "to get in trouble for giving Hilliard something without approval or come down on her like a pile of rocks for not getting preapproval." *Id.* Due to these professionalism concerns connected to his MHD small group class, Plaintiff completed additional coaching sessions to address his professionalism issues. *Id.* ¶ 41.

Plaintiff's conduct in clinical clerkships also raised professionalism concerns. In August 2018, Plaintiff communicated with a female patient he previously met during his pediatric clerkship via text. *Id.* ¶ 42. Plaintiff texted with the patient for about 20 minutes and offered to help her with chemistry. *Id.* Plaintiff believed he could respond to the patient's text messages without consulting his course director because he was simply "being polite." *Id.* When Plaintiff mentioned this conversation to his course director, Dr. Shahid, he told Plaintiff "NOT" to communicate with the patient via text and filed a professionalism report. *Id.* Also, during a clerkship, Plaintiff tried to take a picture "inside the live EPIC environment," the system containing patient information. *Id.* ¶ 43. The doctor instructed Plaintiff not to take

5

a picture, and Plaintiff put his phone away. *Id.* Plaintiff also sent a screenshot of EPIC in an email with unredacted patient information, which he purportedly thought was okay because a different doctor had previously emailed him a screenshot. *Id.* Another doctor on one of Plaintiff's clerkships filed another professional report raising several concerns regarding Plaintiff's conduct, though Plaintiff largely disputes the contents of the report. *Id.* ¶ 44.[3] Plaintiff admits, however, that Dr. Peter Angelos, the Director of the MacLean Center for Clinical Medical Ethics at the University of Chicago, concluded that Plaintiff's conduct raised serious concerns from an ethics and professional perspective regarding Plaintiff's fitness to practice medicine. *Id.* ¶ 45.

Among its requirements, Loyola's Academic Policy Manual sets forth standards for professionalism and requires medical students to pass within three attempts, Step 1 of the United States Medical Licensing Exam ("Step 1"), a test administered by the National Board of Medical Examiners. *Id.* ¶¶ 7, 9, 10; [145-2] at 31. Plaintiff sat for Step 1 in June 2018, November 2018, and August 2019 and failed each time. [153] ¶¶ 21, 22, 27. On September 25, 2019, Plaintiff received a letter dismissing him from Stritch based upon his failure to pass Step 1 within three tries. *Id.* ¶ 27; [145-5], Ex. T. Plaintiff appealed his dismissal, which the Student Appeal Board ("SAB") denied. [153] ¶ 28. Dean Mendez sent Plaintiff a letter stating that the decision was based upon Plaintiff's overall medical school performance, his lack

---

[3] This dispute remains immaterial given the other undisputed facts detailing concerns regarding Plaintiff's professionalism.

6

of self-awareness regarding how his decisions and actions led to his dismissal, and his failure to articulate a realistic plan to pass Step 1 on a fourth attempt. *Id.* ¶ 30. Plaintiff appealed SAB's decision to Dean Callahan, who affirmed the dismissal. *Id.* ¶ 31. Plaintiff filed a complaint with the Office of Civil Rights ("OCR") alleging that Loyola discriminated against him based on his disability by dismissing him and preventing him to sit for Step 1 a fourth time. *Id.* ¶ 32. OCR found Plaintiff's claim contained "insufficient evidence" that Loyola discriminated against Plaintiff based on his disability. *Id.*

## II. Motion to Exclude [165]

The Court first addresses Defendant's motion to exclude Plaintiff's expert Dr. Jon Sand. [165]. Plaintiff relies on Dr. Sand's testimony for the opinions: "Mr. Hilliard was qualified,"[4] "Stritch failed to provide reasonable accommodations to Mr. Hilliard," "Stritch denied Mr. Hilliard the opportunity to participate in or benefit, benefit from and otherwise discriminated against Mr. Hilliard by reason of his disability," and "Stritch's accommodation process was not always interactive." [154] ¶ 10. These assertions, however, constitute legal conclusions, which the Court can disregard, as such testimony remains inadmissible. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

---

[4] Loyola does not dispute that Plaintiff is an individual with a disability, [164] ¶ 1, but disputes that Plaintiff was "a qualified individual with a disability"—a legal conclusion—for the purposes of his failure to accommodate claim, described *infra*. *Id.* ¶ 10.

7

Putting aside these legal conclusions, Dr. Sand's remaining testimony fails to create a genuine dispute of material fact, as his remaining testimony does not change the motion for summary judgment analysis detailed below. Therefore, Defendant's motion to exclude [165] is granted in part, and denied in part as moot.

### III. Motion for Summary Judgment [142]

A party seeking summary judgment must show that there exists no "genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there remains no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323. In evaluating a motion for summary judgment, the Court must "construe all facts and reasonable inferences in a light most favorable to the nonmoving party," *Daza v. Indiana*, 941 F.3d 303, 308 (7th Cir. 2019), but a mere "scintilla of evidence" supporting the non-movant's position does not suffice, *Anderson*, 477 U.S. at 251. Instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.* at 252.

#### A. Reasonable Accommodations

To prove a failure to accommodate claim, Plaintiff must show: (1) he is a qualified individual with a disability; (2) Defendant was aware of his disability; and

8

(3) Defendant failed to reasonably accommodate the disability. *See Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 682 (7th Cir. 2014). The parties agree that Plaintiff has a disability, and that Defendant knew of his disability, thus, this Court focuses upon the third element of the claim.

A request for reasonable accommodation "requires a great deal of communication" between the parties. *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996). While parties should work together in this "interactive process," *see Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996), "the interactive process is not an end in itself"; therefore, "it is not sufficient" for a plaintiff "to show that" a defendant "failed to engage in an interactive process or that it caused the interactive process to break down." *Bunn*, 753 F.3d at 683 (quotation omitted).

First, Plaintiff fails to provide a legal or factual basis for his claim that Stritch failed to provide him with reasonable accommodations. *See* [152] at 2–5. Plaintiff merely cites the parties' statements of facts and the legal conclusions in his expert's report which, as already discussed, the Court disregards. *Id.*; *supra* section II. Since Plaintiff fails to develop argument, the Court considers this claim waived. *Braun v. Vill. of Palatine*, 56 F.4th 542, 553 (7th Cir. 2022) ("A litigant 'waives an argument by failing to make it before the district court.' This rule applies when 'a party fails to develop arguments related to a discrete issue' . . . .") (first quoting *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011); and then citing *Lekas v. Briley*, 405 F.3d

9

602, 614 (7th Cir. 2005) (finding waiver because party "did not present legal arguments or cite relevant authority to substantiate that claim")); *see also U.S. v. Useni*, 516 F.3d 634, 658 (7th Cir. 2008) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel.") (quoting *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986)).

Even if Plaintiff did not waive the issue, Plaintiff's claim would nevertheless fail based upon the undisputed portions of the record. Plaintiff admits that Loyola granted several accommodation requests: double time on written exams, extended time on clinical exams, separate testing space for written exams, prior access to small group question sets, delayed clerkship exam schedules, and additional time for clinical presentations, patient notes, and record review within the limits of the learning environment. [153] ¶ 56. Plaintiff further admits that Defendant did participate in communications with Plaintiff regarding his disability and reasonable accommodations. When Plaintiff had difficulty in a course, he could "go ask about that difficulty and then an accommodation would be made or suggested or offered," *id.* ¶ 50, he met with a number of individuals on multiple occasions to discuss accommodations or preparation for class or exams, and he met with Dr. Hopps and Dean Sonntag regularly in preparation for his first attempt at Step 1. *Id.* ¶¶ 52–53. The record thus confirms that Loyola, in fact, participated in good faith to help

Plaintiff determine appropriate accommodations to support him in the program, and provided such accommodations.

Despite such efforts to accommodate, Plaintiff argues that Loyola's failure to provide additional accommodation requests violated the ADA and Rehabilitation Act. *See* [152] at 15. Under the ADA and Rehabilitation Act, however, Loyola has no obligation to grant all accommodation requests, only "reasonable modifications" that do not "fundamentally alter" its program. 42 U.S.C. § 12182(a)(2)(A)(ii). Here, Loyola did, in fact, grant some of the accommodations Plaintiff asserts were denied, once Plaintiff provided further information about the requested accommodation. In at least one instance, if Loyola mistakenly failed to provide Plaintiff's approved accommodation, the school rectified the mistake by offering Plaintiff another opportunity for the task. As to the other denied accommodations (including denying Plaintiff the opportunity to sit for Step 1 a fourth time), Plaintiff offers no argument or explanation that his requested accommodations were reasonable or would not "fundamentally alter" the medical school program. Since the "plaintiff bears the initial burden of showing that" the requested accommodation "is reasonable on its face," this lack of evidence and argument dooms his claim. *Williams v. Bd. of Educ. of City of Chi.*, 982 F.3d 495, 507 n.28 (7th Cir. 2020) (quoting *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 535 (7th Cir. 2013)).

Plaintiff may wish that Stritch did more to accommodate his disability and engage in the interactive process, but Loyola only needed "to participate in good faith"

11

and "make reasonable efforts to help the other party determine what specific accommodations are necessary." *Beck*, 75 F.3d at 1135. In short, the undisputed facts show that Loyola did make reasonable efforts to communicate with Plaintiff and provided reasonable accommodations in good faith, as required by law. As the "put up or shut up" moment, the summary judgment stage requires a plaintiff to "show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). If the plaintiff's claims are "backed up by a measure of plausible evidence," that "might well merit a trial"; alternatively, if "there is not enough support" for "a factfinder to rule in their favor," summary judgment is appropriate. *Id.* Here, Plaintiff fails to provide such sufficient evidence, and thus his claim must fail.[5]

### B. Dismissal from Stritch

Plaintiff claims that Loyola discriminated against him when Loyola dismissed him from Stritch in 2019. [113] ¶¶ 52, 53. Such a discrimination claim requires proof that: (1) Plaintiff "suffers from a disability as defined in the statutes"; (2) he is "qualified to participate in the program in question"; and (3) he was "either excluded from participating in or denied the benefit of that program based on his disability."

---

[5] Even if Loyola failed to provide reasonable accommodations, Plaintiff cannot show he was a "qualified individual with a disability," or in this context, a "person who meets the academic and technical standards requisite to admission or participation" in the school's "education program or activity." *Knapp v. Northwestern Univ.*, 101 F.3d 473, 482 (7th Cir. 1996) (quotation omitted). The Court discusses whether Plaintiff was a "qualified individual" *infra*.

*Novak v. Bd. of Trs. of S. Ill. Univ.*, 777 F.3d 966, 974 (7th Cir. 2015) (citing *Jackson v. City of Chicago*, 414 F.3d 806, 810 (7th Cir. 2005)).

Following the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, courts utilize a holistic approach which supplements, rather than alters, the burden-shifting framework for discrimination claims that the Supreme Court created in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). *See Davis v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (discussing *Ortiz*'s impact on methods of proof in discrimination cases). Under this approach, Plaintiff must show "evidence that would allow a reasonable jury to infer that" Defendant "treated him differently because of" his disability. *Lisle v. Welborn*, 933 F.3d 705, 719–20 (7th Cir. 2019) (citing *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Courts consider such evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Ortiz*, 834 F.3d at 765. But the core question on summary judgment remains, "has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David v. Bd. of Trs. Of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (citing *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013)). Courts still conduct the *McDonnell Douglas* analysis, however, if the parties present arguments "in those terms," but still assess the plaintiff's evidence "cumulatively" under *Ortiz*. *See id*.

Here, the parties organize their arguments utilizing the *McDonnell Douglas*

13

framework; therefore, the Court will assess the evidence in accordance with the *McDonnell Douglas* framework and additionally review the record holistically, analyzing whether it permits a reasonable factfinder to conclude that Defendant dismissed Plaintiff based upon his disability. *See Ortiz*, 834 F.3d at 765.

*McDonnell Douglas* requires a plaintiff to state a prima facie case of discrimination by showing that: "(1) he is disabled, (2) he is qualified to participate in the program, (3) he suffered an adverse action, and (4) nondisabled students were treated more favorably." *Novak*, 777 F.3d at 974. Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to offer "a legitimate, non-discriminatory reason for any alleged adverse action toward the plaintiff." *Id.* If the defendant does so, the employer merits summary judgment unless the plaintiff presents evidence that the proffered reasons exist merely as pretexts for discrimination. *Id.* The parties do not dispute that Plaintiff suffers from a disability nor that he suffered an adverse action in his dismissal from Loyola. The Court thus focuses on the issues in dispute: whether Plaintiff qualifies under the statute and whether his dismissal was based on his disability.

### i. Plaintiff's Qualification for Stritch

Loyola requires its medical students to pass Step 1 within three attempts. [153] ¶¶ 9, 10. While Plaintiff acknowledges he failed to meet this requirement, he argues that Loyola should have granted his request to remain enrolled at Stritch for a fourth attempt. For its part, Loyola contends that Plaintiff was not qualified to

14

remain a student for additional reasons, and the additional deficiencies in his performance, together with his failure to pass Step 1 after three attempts, supported the decision to uphold Plaintiff's dismissal.

In the context of postsecondary education, a student is qualified if they can meet "the academic and technical standards requisite to admission or participation in the [school's] education program or activity," where "'technical standards' means 'all nonacademic admissions criteria that are essential to participation in the program in question.'" *Knapp*, 101 F.3d at 482 (first citing 34 C.F.R. § 104.3(l)(3); then citing 34 C.F.R. pt. 104, app. A, subpt. A(5); and then citing 45 C.F.R. pt. 84, app. A, subpt. A(5)) (alteration in original); *see also Gilfillan v. Bradley Univ.*, 854 Fed. App'x 729, 732 (7th Cir. 2021) ("A person is qualified for a program if she can meet its requirements, as reflected in the program's standards and the judgment of the faculty, with or without reasonable accommodations."). The Seventh Circuit has recognized that passing an exam required for licensure can determine whether an individual with a disability is "qualified." *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 242 (7th Cir. 2018) (citing *Leisen v. City of Shelbyville*, 153 F.3d 805, 808 (7th Cir. 1998)). Though courts should not apply a "separate and more lenient" standard for academic decisions concerning a student's qualification, "when assessing the evidence in such cases, courts must understand the nature and mission of the institutions and evaluate the evidence accordingly." *Novak*, 777 F.3d at 976.

15

The undisputed facts show that Plaintiff could not meet Stritch's requirements for its medical school program. First, Plaintiff failed to pass Step 1 in three attempts, as required by the Loyola student handbook. *See Rodrigo*, 879 F.3d at 242. While some students were allowed to continue at Stritch after failing three times, the students that Plaintiff identifies were initially dismissed and then, in practice, successfully petitioned for their reinstatement, or an exception to the policy. *See* [164] ¶ 19. Therefore, passing Step 1 within three attempts functions as a requirement for qualification. *See Rodrigo*, 879 F.3d at 242.

Likewise, at Stritch, professionalism "is considered in determining satisfactory academic progress," and failure to meet those expectations "is grounds for consideration of dismissal." [153] ¶ 7; [145-2] at 41. Loyola mandates professional conduct and behavior in educational and clinical environments, including the practice of academic honesty, being "punctual and reliable in meeting obligations for courses and clerkships," using "the highest standards of professional ethical, and moral conduct" and conscientiously caring for patients, behaving "in a collegial way that enhances the ability of others to learn or care for patients," and refraining "from any action or conduct that may be considered unprofessional or unethical." [153] ¶ 7; [145-2] at 41–42.

In this case, Plaintiff does not dispute the occurrence of numerous incidents that raised concerns regarding his professionalism, namely, improper communication with a pediatric patient, inappropriate interactions with classmates and staff, and

16

conduct during clinics that went against confidentiality policies. Rather than dispute these facts, Plaintiff claims that these complaints "do not relate to bad treatment of others, but to him learning about the bounds of confidentiality." [152] at 8. Even if these incidents were the result of "learning experiences," a school may properly determine that such "learning experiences" remain inappropriate within the course of the program and reflect a lack of qualification. Indeed, Loyola's student handbook demands professional behavior, [153] ¶ 7; [145-2] at 41, and notes that understanding professional conduct and behavior functions as a "prerequisite skill" for continued qualification in the program. *See Rodrigo*, 879 F.3d at 242 ("Prerequisites might include an appropriate educational background, employment experience, particular skills and licenses."). Therefore, while Plaintiff may dispute the context of these incidents, the undisputed facts underlying the incidents and expressed concerns about professionalism by several clinical supervisors and professors remain sufficient to prove that Plaintiff's professionalism, a requirement for qualification, was deficient.

      Finally, the undisputed facts showed that Plaintiff struggled academically, received several failing grades (some of which he remediated), and also received concerning reports from professors. This academic performance, together with his inability to pass Step 1, and concerns regarding his professionalism suffice to support Defendant's decision that Plaintiff was not qualified to remain in Stritch. Therefore,

17

Plaintiff fails to prove that he meets the second requirement of the *McDonnell Douglas* test that he be qualified to participate in the program.

### ii. Different Treatment of Non-disabled Students

To show that nondisabled students were treated more favorably, Plaintiff must present a comparator, or a nondisabled student who experienced different treatment and "must be directly comparable to the plaintiff in all material respects," determined by "a common-sense, flexible analysis of relevant factors." *Cung Hnin v. TOA (USA), LLC*, 751 F.3d 499, 504 (7th Cir. 2014); *see also Charleston v. Bd. of Trs. of the Univ. of Ill. at Chi.*, No. 12-cv-9463, 2013 WL 1751519, at *5 (N.D. Ill. Apr. 19, 2013). While the inquiry "is not a mechanical comparison, it requires enough common factors to determine if intentional discrimination was at play." *Cung Hnin*, 751 F.3d at 504; *see also Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014) (stating the analysis does not require "near one-to-one mapping between" comparators); *Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007) (requiring "enough common factors . . . to allow for a meaningful comparison").

Plaintiff argues that since Stritch allowed other students to take the Step 1 exam a fourth time, he has presented sufficient evidence that nondisabled students were treated differently. [152] at 8. Plaintiff, however, fails to explain (and the record offers no support about) how these other students are materially similar to Plaintiff, other than failing Step 1 three times. By failing to develop a proper comparator, Plaintiff thus waives this issue. *Braun*, 56 F.4th at 553; *see Useni*, 516 F.3d at 658.

18

Even if Plaintiff did not waive the issue, the record also provides no indication that the other students (who received permission to take Step 1 a fourth time while enrolled at Stritch) function as appropriate comparators for Plaintiff. *See* [154-19]. The record does not demonstrate (and Plaintiff does not develop facts showing) whether these other students performed poorly academically, received concerning reports regarding their professionalism, or shared any other characteristics material to Plaintiff's situation. The record merely shows that such students existed, without any further details. Therefore, Plaintiff fails to carry his burden on the fourth requirement of the *McDonnell Douglas* framework and fails to prove a discrimination claim based upon his disability.

### iii. *Ortiz* Holistic Approach

Plaintiff's claim also fails under *Ortiz*. Plaintiff does not provide evidence showing that his dismissal from Stritch was the result of intentional discrimination based upon his disability. Despite the reasonable accommodations provided by Loyola, discussed *supra*, the record shows Plaintiff "was not qualified for the program when" he "was dismissed." *Gilfillan*, 854 Fed. App'x at 732. Loyola's decision to dismiss Plaintiff relied on several non-discriminatory factors: his failure to pass Step 1 within three attempts, his academic performance, his concerning conduct in the classroom and clinics, and an administrative lack of confidence that Plaintiff could pass Step 1 on a fourth attempt. The record does not lead to any reasonable inference that Defendant's decision was based upon discrimination toward Plaintiff due to his

19

disability. *See Ortiz*, 834 F.3d at 765 (stating the standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's" disability "caused the discharge").

Finally, the record does not offer any suggestion of pretext, or that Loyola's decision to dismiss Plaintiff based upon his failure to pass Step 1 within three attempts, professionalism concerns, and academic performance was just a pretense to dismiss Plaintiff due to his disability. Without any evidence supporting such an inference, the Court appropriately grants Defendant's motion for summary judgment as to Plaintiff's claim regarding his dismissal from Stritch.

## IV. Conclusion

For the reasons explained above, this Court grants Defendant's motion for summary judgment, [142], and denies Defendant's motion to exclude, [165], as moot. The Court directs the Clerk to enter judgment in favor of Defendant. All dates and deadlines are stricken. Civil case terminated.

Date: February 24, 2026

                                      ENTERED:

                                      John Robert Blakey
                                      United States District Judge